UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY <br><br> Plaintiffs, <br><br> -against- <br><br> Q PHARMACY RX INC, BORIS YUSUPOV, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5, <br><br> Defendants. | CIVIL ACTION <br><br> 24-CV-6617 <br><br> COMPLAINT <br><br> (JURY TRIAL DEMANDED) |

Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company (interchangeably referred to herein as "Plaintiffs" and "Allstate"), by their attorneys Manning & Kass, Ellrod, Ramirez, Trester LLP, for their Complaint against Defendants Q Pharmacy RX Inc ("Q Pharmacy") and Boris Yusupov ("Yusupov") (Q Pharmacy and Yusupov are collectively referred to as "Pharmacy Defendants"), John Does 1 through 5, and ABC Corporations 1 through 5 (collectively, "Defendants") allege as follows:

## PRELIMINARY STATEMENT

1.     From at least 2020 and continuing through the filing of this Complaint, Defendants engaged in a massive scheme to defraud Plaintiffs, through the exploitation of New York's Comprehensive Motor Vehicle Insurance Reparations Act (popularly known as the "No-fault Law").

2.     Pursuant to the No-fault Law, policyholders and others who suffer injuries in automobile accidents ("Covered Persons") can obtain payments from the policyholders' automobile insurance companies, including Plaintiffs, for necessary medical care ordered by the Covered Persons' physicians or prescribing providers. Covered Persons are also permitted to

assign those benefits to doctors and other licensed healthcare providers, including pharmacies, enabling them to bill insurance companies directly for their services.

3.      This action seeks to recover more than $469,000.00 that Defendants stole from Plaintiffs, and other economic injuries suffered by Allstate which flowed directly from the submission of hundreds of false and/or fraudulent insurance claims, seeking reimbursement for specifically-targeted, medically unnecessary "pain relieving" pharmaceutical products, including topical pain creams, gels, lotions, ointments and patches, and a limited variety of other oral medications.

4.      As part of the scheme to defraud alleged herein, the Pharmacy Defendants entered into illegal kickback arrangements with No-fault clinics in the New York metropolitan area (the "No-fault Clinics") and unlicensed laypersons who own, manage, operate, work at, control, or are associated with the No-fault Clinics ("Clinic Controllers").

5.      Pursuant to these arrangements, and in exchange for kickbacks and/or other financial consideration, the Clinic Controllers, which are not named as defendants in this action, facilitated the scheme by ensuring that their associated doctors, orthopedic surgeons, and/or nurse practitioners (hereinafter "Healthcare Practitioners" or "HCPs") prescribed expensive, topical pain creams, gels, lotions, ointments, and patches dispensed and billed in exorbitant prices by Q Pharmacy, including, Lidocaine 5% ointment or transdermal patches, Diclofenac Sodium 3% gel, Diclofenac 1%-Lidocaine 4.5% gel (at times prescribed and/or billed under the brand name Diclona )("Diclona gel"), and Lidocaine 4.5%-Menthol 5% transdermal patches (at times prescribed and/or billed under the brand name Lidothol) ("Lidothol patches"), (collectively, the "Topical Pain Pharmaceuticals"), as well as a select few oral medications, primarily in the form of a limited variety of nonsteroidal anti-inflammatory drugs ("NSAIDs"), such as Ibuprofen,

Meloxicam, Naproxen, and Celecoxib, and a limited variety of muscle relaxers, such as Baclofen, Cyclobenzaprine, and Tizanidine. These medications were routinely prescribed to Covered Persons, rather than commercially available and more affordable over-the-counter medications and pain creams, gels, lotions, ointments, and/or patches that have been approved by the FDA. Q Pharmacy targeted the Topical Pain Pharmaceuticals and other select oral medications rather than the cheaper over-the-counter alternatives for no other purpose than to submit fraudulent, inflated bills to Plaintiffs for reimbursement, exploiting the Covered Persons for financial gain, without regard to genuine patient care.

6.      In furtherance of Defendants' scheme to defraud, Covered Persons who were purportedly involved in automobile accidents would present to No-fault Clinics where they would, as a matter of pattern, practice and protocol, purportedly undergo an aggressive pre-determined course of treatment, which included the prescription of certain medications specifically targeted for their high profit margins, including Topical Pain Pharmaceuticals and/or a limited variety of other medications such as NSAIDs or muscle relaxers, irrespective of medical necessity.

7.      Months after the accident, as part of the fraudulent protocol of treatment, many of the Covered Persons are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey. These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medically necessary.

8.      Covered persons would then be prescribed an additional round of the same Topical Pain Pharmaceuticals, oral NSAIDs and/or muscle relaxers, irrespective of medical necessity.

9.      The prescriptions, which were issued by the HCPs at the direction of and/or pursuant to the treatment protocol orchestrated by the Clinic Controllers and sent to Q Pharmacy

for dispensing and billing, were, at times, tailored to boilerplate evaluation and/or operational reports designed to limit the prescribing providers' prescriptions to a predetermined treatment protocol, and justify continued, voluminous and excessive use of prescribed pharmaceuticals, including the Topical Pain Pharmaceuticals and other select oral medications.

10.     To effectuate the scheme and maximize profits, the Pharmacy Defendants dispensed a handful of specific pain medications, including the Topical Pain Pharmaceuticals and a select few oral NSAIDs and muscle relaxers, based solely on the medications' exorbitant pricing and high profit margins.  In exchange for kickbacks and financial incentives and pursuant to collusive, illegal arrangements, the Pharmacy Defendants, through the Clinic Controllers, induced the HCPs to prescribe these targeted, exorbitantly priced pain medications, including the Topical Pain Pharmaceuticals and other select NSAIDs and muscles relaxers, without regard to genuine patient care, and directed large volumes of these prescriptions to Q Pharmacy.

11.     Once the Topical Pain Pharmaceuticals and/or other oral medications were prescribed, if they were dispensed at all, the pharmaceuticals were either given to Covered Persons directly at the No-fault Clinics or ASCs, or mailed to the Covered Persons from Q Pharmacy. Covered Persons were not given any choice as to where their prescriptions would be filled.

12.     When the Pharmacy Defendants purported to provide the Topical Pain Pharmaceuticals and/or other medications to Covered Persons covered by Plaintiffs, Q Pharmacy sought reimbursement directly from Plaintiffs pursuant to executed "Assignment of Benefit" ("AOB") forms and New York State Department of Insurance claim form ("NF-3"), often with

additional forms listing each billed-for pharmaceutical by its national drug code ("NDC")[1] number.

13.     The Pharmacy Defendants also never submitted wholesale purchase invoices to Plaintiffs demonstrating the NDC number for the pharmaceuticals Q Pharmacy obtained and how much Q Pharmacy actually paid the suppliers for these pharmaceuticals, or whether Q Pharmacy actually purchased the pharmaceuticals with the NDC numbers listed in the billing submissions.

14.     At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by Yusupov through Q Pharmacy sought reimbursement for Topical Pain Pharmaceuticals or other select NSAIDs and muscles relaxers that the Pharmacy Defendants could readily buy at a low cost and bill to Plaintiffs at inflated amounts based on egregiously high wholesale prices.  Defendants, in concert with the Clinic Controllers, steered the HCPs to prescribe these pharmaceuticals specifically because of their high profit margins, irrespective of medical necessity, pharmacological outcome or genuine patient care and despite the availability of cheaper over-the-counter and FDA-approved medications.

15.     On information and belief, by entering into kickback arrangements with the No-fault Clinics and/or Clinic Controllers for a steady supply of prescriptions for Topical Pain Pharmaceuticals and/or a select number of oral medications, and by dispensing these Topical Pain Pharmaceuticals and other medications irrespective of medical necessity pursuant to bogus prescriptions, Defendants engaged in conduct which demonstrated a blatant disregard for the laws of New York State which govern the proper operation of a pharmacy and the proper dispensing of drug products, as well as laws which prohibit illegal fee splitting and the solicitation of patients.

---

[1] A National Drug Code ("NDC") number is a unique 10-digit code that identifies each prescription drug product (whether brand name or generic) by the drug itself, the vendor of the drug and the quantity in which the drug was packaged.

16.     By way of example and not limitation, New York Education Law § 6509-a, prohibits a professional licensee, such as a pharmacy, from directly or indirectly requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications, and 8 N.Y.C.R.R. § 29.1(b)(3) prohibits a professional licensee, such as a pharmacy from directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

17.     In addition, the Official Compilation of Codes, Rules and Regulations of the State of New York governing Official Prescriptions, Section 910.2(f), states that an order purporting to be a prescription that is not issued for legitimate medical purposes is not a prescription within the meaning of the New York State Education Law and the New York State Public Health Law and the person knowingly dispensing such an order, as well as the person issuing such order, shall be subject to all penalties provided in law or regulations.

18.     The scheme to defraud orchestrated by the Pharmacy Defendants by which they routinely dispensed the Topical Pain Pharmaceuticals and/or a limited variety of other medications, including NSAIDs and muscle relaxers, without regard to medical necessity, not only demonstrated a deliberate disregard for the laws of New York State in furtherance of theft from Plaintiffs, but also posed a significant risk to the health of patients.

19.     Yusupov, through Q Pharmacy, fraudulently submitted, or caused to be submitted, bills to Plaintiffs for Topical Pain Pharmaceuticals and a select variety of oral medications, including NSAIDs and muscle relaxers, that were provided to Covered Persons (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-

determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) were the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.  By way of example and not limitation, Exhibit "1" in the accompanying Compendium of Exhibits is a spreadsheet listing representative samples of claims Plaintiffs paid to Q Pharmacy for Topical Pain Pharmaceuticals and the select variety of oral medications that were provided (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) as the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.

20.     In each instance, the Pharmacy Defendants knew or should have known that the claims they submitted to Plaintiffs were bogus and contained material and misleading statements regarding the propriety of the billed-for services. In particular, the Pharmacy Defendants knew or should have known that the claims that they submitted to Plaintiffs were for Topical Pain Pharmaceuticals and a select variety of oral pain medications which were provided: (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements and the product of illegal and/or invalid prescriptions.

21.     On information and belief, the Defendants willfully engaged in the practices alleged herein with the sole object of converting money.

22.     In addition to payments resulting from fraudulent claims, the fraudulent activities engaged in by Defendants caused Plaintiffs to suffer further economic injury, including, but not

limited to, expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

23.     It was a foreseeable consequence of Defendants' scheme to defraud that Plaintiffs would incur expenditures in an effort to verify Defendants' fraudulent claims.

24.     At all times relevant herein, but-for the Pharmacy Defendants' fraudulent misrepresentations, Plaintiffs would not have incurred expenditures in an effort to verify Defendants' fraudulent claims.

25.     At all times relevant herein, Defendants fraudulent misrepresentations directly and proximately resulted in Plaintiffs incurring expenditures in an effort to verify the Pharmacy Defendants' fraudulent claims.

26.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeering Influenced and Corrupt Organization Act ("RICO") applies. The Defendants adopted a fraudulent blueprint regarding the dispensing of pharmaceuticals, including but not limited to Topical Pain Pharmaceuticals and a select variety of oral medications, including NSAIDs and muscle relaxers, as their business plan, and used it to participate in a systematic pattern of racketeering activity. Every facet of Defendants' operations, from the creation of fraudulent NF-3s, to the formation of kickback arrangements with the No-fault Clinics and Clinic Controllers, to the illegal bulk dispensing of Topical Pain Pharmaceuticals and a select variety of oral medications, including NSAIDs and muscle relaxers, to record keeping to billing, was carried out for the purpose of committing fraud.

27.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits

reimbursement of No-fault benefits to legitimate insurance claims for pharmaceutical products.  In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of Q Pharmacy's claims for Topical Pain Pharmaceuticals or the other select variety of oral medications, including NSAIDs and muscle relaxers, submitted to Plaintiffs for reimbursement because they were provided (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements and the product of illegal and/or invalid prescriptions. By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing a representative sample of unpaid No-fault claims from Q Pharmacy of approximately $661,000.00, which form the basis of Plaintiffs' request for declaratory relief.  Said spreadsheet is grouped by claim number, date of service and the amount pending.

## STATUTORY/REGULATORY SCHEME

28.     Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including pharmacies, enabling them to bill insurance companies directly for their services.

29.     As alleged herein, the Pharmacy Defendants exploited and continue to exploit the No-fault Law by obtaining such assignments, and dispensing and billing for Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, that if

provided at all, were medically unnecessary and provided pursuant to a fraudulent protocol in which in which virtually all Covered Persons were prescribed the Topical Pain Pharmaceuticals and/or the select variety of oral medications irrespective of need and in violation of state and/or federal law.

30.     Q Pharmacy is ostensibly a licensed pharmacy that bills for pharmaceuticals provided to, among others, individuals covered under the No-fault Law. In exchange for their services, Q Pharmacy accepted assignments of benefits signed by Covered Persons and submitted claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

31.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq.*, Q Pharmacy submitted bills for their claims to Plaintiffs using the claim form prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or NF-3 form, or a substantially similar form.

32.     Pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by Q Pharmacy contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime….

33.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

34.      Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a pharmacy, may recover for health service-related expenses. In particular, under this section, such persons are only entitled to reimbursement

of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

35.     Pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault law.  11 N.Y.C.R.R. § 68.1.

36.     Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") which is a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged. Each NDC number has an assigned Average Wholesale Price ("AWP").

37.     Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained. The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

38.     The maximum amount that a healthcare provider may charge for a medically necessary prescription drug or product pursuant to the No fault Law is based upon the drug's NDC number.

39.     Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

40.     For each generic drug, the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

41.     AWP is defined by 12 N.Y.C.R.R. § 440.2(a) as:

> "[t]he average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health or any successor publisher, on the day a prescription drug is dispensed or other nationally recognized drug pricing index adopted by the Chair or Chair's designee."

42.     On information and belief, Q Pharmacy was created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

43.     On information and belief, Defendants intentionally targeted Topical Pain Pharmaceuticals with extremely expensive AWPs in order to inflate the billing submitted through Q Pharmacy and to maximize their profits.

44.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, to the extent that they provided any Topical Pain Pharmaceuticals at all.

## NATURE OF THE ACTION

45.     This action is brought pursuant to:

i)      The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. § 1962(c);

ii)     New York State Common Law; and

iii)    The Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

## NATURE OF RELIEF SOUGHT

46.     Plaintiffs seek treble damages that they sustained as a result of the Defendants' schemes and artifices to defraud, and acts of mail fraud (pursuant to 18 U.S.C. § 1341), in connection with their use of the facilities of the No-fault system and its assignment of benefits mechanism to fraudulently obtain payments from Plaintiffs for pharmaceutical products, including but not limited to Topical Pain Pharmaceuticals that it allegedly dispensed to individuals covered by Plaintiffs under New York State's No-fault Law.

47.     Plaintiffs seek compensatory and punitive damages under the Common Law.

48.     Plaintiffs further seek recovery of the No-fault claim payments made under the independent theory of unjust enrichment.

49.     Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of Defendants' unpaid No-fault claims for Topical Pain Pharmaceuticals and select other oral medications, including NSAIDs and muscle relaxers, which were dispensed pursuant to the fraudulent scheme set forth herein.

50.     As a result of Defendants' actions alleged herein, Plaintiffs were defrauded an amount in excess of $469,000.00, the exact amount to be determined at trial, in the form of payments to Defendants and/or expenses incurred by Plaintiffs as a result of Defendants fraudulently billing Plaintiffs for Topical Pain Pharmaceuticals and select other oral medications, primarily in the form of oral pain relievers and muscle relaxants, that they knew or should have known were provided (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements that were the product of illegal and/or invalid prescriptions.

**THE PARTIES**

A.   **Plaintiffs**

51.    Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

52.    Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

53.    Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

54.    Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

55.    Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company are collectively referred to herein as "Plaintiffs."

B.   **Defendants**

56.    Boris Yusupov ("Yusupov") is a natural person residing in the State of New York and is the principal record owner, officer and/or operator of Defendant Q Pharmacy, and at all times relevant herein, operated, managed, and/or controlled its activities.

57.    Q Pharmacy RX Inc ("Q Pharmacy") formed on or about February 10, 2020, was first registered as a pharmacy with the New York State Office of Professions on May 25, 2021, and purports to operate its principal place of business located at 82-36 Lefferts Boulevard, Kew Gardens, New York 11415.  Q Pharmacy is operated, managed, and/or controlled by Defendant

Yusupov and submitted fraudulent claims to Plaintiffs seeking reimbursement for pharmaceutical products under the No-fault Law.

58.     On information and belief, John Does 1 through 5 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

59.     On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiffs that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme.  These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

60.     The jurisdiction of the Court arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*.; 28 U.S.C. §§ 1331; and principles of pendent jurisdiction.

61.     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

62.     The Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a), and the claim for declaratory relief based upon 28 U.S.C. § 2201 and § 2202.

63.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York C.P.L.R. § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

64. Venue lies in this District Court under the provisions of 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND

65. Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

66. As set forth in the Statutory/Regulatory Scheme section above, under the Comprehensive Motor Vehicle Insurance Reparations Act of New York State, Ins. Law §§ 5101, *et seq*., Plaintiffs are required to pay, *inter alia*, for health service expenses that are incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

67. Q Pharmacy is ostensibly a pharmacy that bills for prescription pharmaceuticals provided to, among others, individuals covered under the No-fault Law. In exchange for its services, Q Pharmacy accepts assignments of benefits from Covered Persons covered under the No-fault Law and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

68. The Pharmacy Defendants purportedly dispensed pharmaceutical products to Covered Persons for the purported treatment by the No-fault Clinics, and often referred by the No-fault Clinics for medically unnecessary surgical consultations and purportedly underwent medically unnecessary and arthroscopic procedures at ASCs in New York or New Jersey for treatment of soft tissue injuries, such as sprains, and musculoskeletal pain, and often those, who were subsequently and submitted claims for payment to Plaintiffs for such services.

69.     In purported compliance with the No-fault Law and 11 N.Y.C.R.R. 65 et seq., the Pharmacy Defendants submitted proof of their claims to Plaintiffs using a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or NF-3 form or a substantially similar form.

70.     Pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by the Defendants contained the following (or substantially similar) warning on the back of the claim form:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, may be guilty of a criminal act punishable under law and may be subject to civil penalties.

71.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process claims within 30 days of receipt of the proof of claim.

72.     To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Yusupov through Q Pharmacy in support of their claims for pharmaceutical products, and paid Q Pharmacy based on the representations and information that Defendants submitted to Plaintiffs.

73.     At all relevant times Q Pharmacy was an illegal enterprise that engaged in common, systematic, and pervasive fraudulent practices.

74.     Q Pharmacy, which is purportedly owned, operated, and controlled by Yusupov was part of a racketeering scheme that distinguished it from a legitimate healthcare provider/pharmacy as follows:

- Unlike legitimate pharmacies, Q Pharmacy routinely misrepresented that it was dispensing Topical Pain Pharmaceuticals and select oral medications pursuant to legitimate New York State Prescriptions, when it was not;

- Unlike legitimate pharmacies, Q Pharmacy dispensed pharmaceuticals to fill fraudulent and boilerplate prescription forms it received from the No-fault Clinics pursuant to illicit kickback agreements;

- Unlike legitimate pharmacies, Q Pharmacy, arranged to have prescriptions submitted to them by the HCPs without allowing the patients the option to determine which pharmacy would fill their prescription;

- Unlike legitimate pharmacies, Q Pharmacy misrepresented that it was in conformance with material licensing requirements which would entitle it to reimbursement of No-fault benefits when, in fact, it was involved in collusive relationships with providers that issue illegal prescriptions pursuant to an unlawful kickback arrangement and/or other financial incentives; and

- Unlike legitimate pharmacies, Q Pharmacy entered into kickback agreements with No-fault Clinics in order to generate a large volume of prescriptions pursuant to a fraudulent, pre-determined treatment and billing protocol whereby Covered Persons received Topical Pain Pharmaceuticals and/or other oral medications irrespective of medical necessity.

75.    At all relevant times mentioned herein, the Pharmacy Defendants, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and/or claim forms, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

76.    At all relevant times mentioned herein, the Pharmacy Defendants, and the Clinic Controllers, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

77.    In these and numerous other ways, the Defendants sought to deceive Plaintiffs into paying fraudulent medical claims.

A.  **The Fraudulent Prescriptions and Examination Reports**

78.     As a matter of pattern, practice and protocol, the HCPs and No-fault Clinics routinely prescribed, or purported to prescribe, the Topical Pain Pharmaceuticals and select other medications, including NSAIDs and muscle relaxers, pursuant to a predetermined protocol irrespective of medical necessity.

79.     On information and belief, in furtherance of this predetermined protocol and in order to further facilitate the fraud set forth herein, Defendants entered into agreements with one or more of the No-fault Clinics, Clinic Controllers and HCPs to utilize generic, boilerplate examination reports specifically designed to justify the continued and voluminous use of medically unnecessary Topical Pain Pharmaceuticals and other select oral medications, including NSAIDS and muscle relaxers.

80.     By way of example and not limitation, in many instances, the generic, boilerplate examination reports were pre-printed and routinely contained the following predetermined medications, with preset options for strength and/or directions on how often to take or apply the medications prescribed, which the prescribing providers could select by circling the name and strength of the medication on the generic, preprinted, boilerplate examination report.  Exhibit "3" in the accompanying Compendium of Exhibits is a sampling of the generic, preprinted, boilerplate examination reports utilized by the No-fault Clinics, Clinic Controllers, and prescribing providers.

81.     The No-fault Clinics, Clinic Controllers and HCPs would, in many instances, utilize generic, preprinted, boilerplate examination reports with preprinted medications designed to intentionally limit the pharmaceutical options available to Covered Persons to those which could reap Defendants the most profits, notwithstanding any perceived benefit or harm to Covered Persons.

82.     Moreover, the reliance upon generic, preprinted, boilerplate examination reports by No-fault Clinics, Clinic Controllers and/or prescribing providers renders the prescriptions submitted by Defendants to Plaintiffs in violation of Section 910 of the Official Compilation of Codes, Rules and Regulations of the State of New York, which provides that:

> "[a] prescription shall be issued by a practitioner for legitimate medical purposes in good faith and in the course of his or her professional practice only. An order purporting to be a prescription that is not issued for legitimate medical purposes is not a prescription within the meaning of the New York State Education Law and the New York State Public Health Law and the person knowingly dispensing such an order, as well as the person issuing such order, shall be subject to all penalties provided in law or regulations."

*See* 10 N.Y.C.R.R. § 910(2)(f).

83.     On information and belief, at all times relevant herein, the Defendants knew or should have known that the pre-printed, boilerplate evaluation forms were bogus.

**B.     Overview of Laws and Regulations**

***Overview of Guidelines for Topical Pain Pharmaceuticals***

84.     On information and belief, topical pain creams, such as Diclofenac Sodium gel 3% and Lidocaine 5% ointment, are a type of topical pain-relief drug that are "locally administered treatments".

85.     The role of topical pain creams in pain management is not a scientifically proven fact. By way of example and not limitation, according to medical literature, due to the absence of specific compliance and adherence studies comparing topical treatment versus traditional routes in pain management, the role of topical preparations in patient adherence remains obscure.

86.     Topical pain creams should undergo trials, including in the case of topical lidocaine, a trial in the range of 2-4 weeks.

87.     The ingredients used in the Topical Pain Pharmaceuticals include NSAIDs, which is not always appropriate in some clinical settings. For example, it is well known that people who use NSAIDs (other than aspirin) may have a higher risk of having a heart attack or a stroke than people who do not use those medications, and these events may happen without warning and may even cause death.

88.     The medical standard in reference to topical drug delivery, as presented in the Workers Compensation Board New York Non-Acute Pain Medical Treatment Guidelines, First Edition, September 15, 2014, pages: 37-38, and current edition, effective May 2, 2022, page 39, states the following: "For most patients, the effects of long-term use are unknown and thus may be better used episodically. These agents may be used in those patients who prefer topical treatments over oral medications."

89.     According to the latest Workers Compensation Board Medical Treatment Guidelines (First Edition, September 15, 2014, pages: 28-38; Current edition, effective May 2, 2022, page 32) regarding Non-Acute Pain, "Topical, oral, and/or systemic compound medications are not recommended."

### Overview of New York State Laws and Regulations Regarding Operations of Legitimate Pharmacies

90.     Pursuant to New York State law, a provider of healthcare services is not entitled to reimbursement for No-fault Benefits if the provider fails to meet any applicable New York state or local licensing requirement necessary to perform such service in New York. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

91.     New York Education Law § 6808, prohibits a person, firm, corporation, or association from possessing drugs, prescriptions, or poisons for the purpose of compounding, dispensing, retailing, wholesaling, or manufacturing, or offering drugs, prescriptions, or poisons

for sale at retail or wholesale unless they are registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

92.      New York Education Law § 6530(38) prohibits a licensed physician from entering into an arrangement or agreement with a pharmacy for the compounding and/or dispensing of secret formula ("coded") or specially marked prescriptions.

93.      New York Education Law § 6810(7)(a) prohibits pharmacies from dispensing a drug when a prescription form for the drug includes any other drug.

94.      New York Education Law § 6810(9) prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

95.      New York Education Law § 6811 makes it a crime for any person to enter into an agreement with a physician (or other licensed healthcare provider) for the compounding or dispensing of coded prescriptions.

96.      New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

97.      8 N.Y.C.R.R. § 29.1(b)(3) prohibits a professional licensee from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

98.      New York Education Law § 6530(18) prohibits a licensed physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other

consideration to or from a third party in exchange for patient referrals or in connection with the performance of professional services.

99.     New York Education Law § 6530(17) prohibits pharmacies and other health care professionals from "[e]xercising undue influence" over a patient, including by the "promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party."

100.    8 N.Y.C.R.R. §29.1(b)(2) further provides that it constitutes professional misconduct when a pharmacies or other health care professionals "exercise[] undue influence" over a patient or client including by the "promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party."

101.    8 N.Y.C.R.R. § 63.6(b)(7) requires that pharmacists "conduct a prospective drug review before each prescription is dispensed or delivered to a patient or person authorized to act on behalf of the patient. Such review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse."

102.    New York Education Law § 6808(2)(c), requires that the "names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

103.    New York Education Law § 6808(e) requires that every pharmacy shall be under the immediate supervision and management of a licensed pharmacist.

104. New York Education Law § 6808(e) provides that pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

105. New York Education Law § 6808(e) provides that pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

106. New York Education Law § 6808(h) requires that individual applicants and all officers, directors, and shareholders with at least ten percent interest in corporate applicants "shall be over good moral character."

## MECHANICS OF THE SCHEME TO DEFRAUD

107. Beginning in 2020 and continuing until the present day, Defendants and others not named in the Complaint have engaged in a systematic fraudulent billing scheme based upon the alleged provision of Topical Pain Pharmaceuticals and other select oral medications, such as NSAIDs and muscle relaxers to Covered Persons.

108. Defendant Yusupov, through Q Pharmacy, devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, by making material misrepresentations in bill submissions to Plaintiffs and fraudulently billing for Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, which were provided, if at all, irrespective of medical necessity, pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, and further, cost the Pharmacy Defendants a fraction of the amounts that they materially misrepresented in their fraudulent bill submissions to Plaintiffs.

109.   Defendants engaged in a massive scheme to defraud in which Yusupov, through Q Pharmacy, as a matter of pattern, practice and protocol, manufactured, dispensed, or caused to be dispensed, expensive Topical Pain Pharmaceuticals, including Lidocaine 5% ointment, Diclofenac Sodium 3% gel, Diclona gel, Lidocaine 5% patches, and Lidothol patches, and other specifically targeted, select oral medications, including NSAIDs and muscle relaxers, to Covered Persons irrespective of medical necessity.

110.   As part of the scheme, the Covered Persons receiving the expensive Topical Pain Pharmaceuticals, and other specifically targeted, select oral medications, including NSAIDs and muscle relaxers from Q Pharmacy, were involved in minor accidents, suffering soft tissue injuries, to the extent they suffered any injuries at all, that did not require hospitalization and/or extensive medical treatment.  Shortly after the accident, the Covered Persons are referred for a standard battery of medical treatment from fraudulent "medical mill" multidisciplinary clinics where they are referred for, among other services, physical therapy, chiropractic treatment, acupuncture, several pieces of DME and/or orthotic devices, a protocol of prescription pharmaceuticals consisting of the Topical Pain Pharmaceuticals and other specifically targeted, select oral medications, including NSAIDs, muscle relaxers, and opioids.

111.   Months after the accident, as part of the fraudulent protocol of treatment, many of the Covered Persons are also referred for orthopedic surgical consultations, and ultimately arthroscopic surgeries at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.  These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medically necessary.

112.   Either in connection with the surgical consultation, on the same day as the surgery, and/or within a few short days after the surgery, the Covered Persons are prescribed expensive

prescription pharmaceuticals, consisting of an additional round of the same Topical Pain Pharmaceuticals, oral NSAIDs and oral muscle relaxers that the Covered Persons already received as part of the protocol of treatment taking place at the No-fault Clinics. By way of example and not limitation, the following Covered Persons received the same or similar protocol of Topical Pain Pharmaceuticals, oral NSAIDs and/or oral muscle relaxers as part of their purported treatment at the No-fault Clinic from either Q Pharmacy or multiple pharmacies not named as defendant herein, and received even more Topical Pain Pharmaceuticals, oral NSAIDs and/or oral muscle relaxers from Q Pharmacy either in connection with an orthopedic surgical consultation or following an arthroscopic surgery at an ASC:

- Covered Person P.V. (claim no. 0613736834-03) was allegedly involved in a motor vehicle accident on January 26, 2021. As part of a purported course of treatment, on February 11, 2021, P.V. was prescribed 200g Lidocaine 5% ointment by Professional Pain Management, P.C. (not named as a defendant in the Complaint), which was purportedly filled by Valley Stream RX Inc. (not named as a defendant in the Complaint) on February 21, 2021, for which it billed Plaintiffs $1,524.00. Thereafter, on May 19, 2021 at a No-fault clinic located at 2076 E. 13th Street, Brooklyn, New York, P.V. was again allegedly prescribed 200g Lidocaine 5% ointment, as well as 60 tablets of Naproxen Sodium 550 mg by Dr. Mark Gladstein (not named a defendant in the Complaint), which Top Choice RX (not named a defendant in the Complaint) purportedly filled on May 20, 2021 and for which it billed Plaintiffs $565.12. Thereafter, on June 14, 2021, in advance of lumbar percutaneous discectomy and trigger point injections performed on June 28, 2021, P.V. was prescribed another course of 200g Lidocaine 5% ointment and 60 tablets of Naproxen Sodium 550 mg by Dr. Mark Gladstein, for which Q Pharmacy billed Plaintiffs $1396.00, inclusive of $5.00 in pharmacy dispensing fees. Ultimately, Plaintiffs were billed at least $3,133.00 for 600 mg of Lidocaine Ointment 5% and $347.12 for 120 tablets of Naproxen Sodium 550 mg, as well as $5.00 in pharmacy dispensing fees.

- Covered Person V.M. (claim no. 0649642962-03) was allegedly involved in a motor vehicle accident on October 25, 2021. As part of a purported course of treatment at a No-fault clinic located at 332 E. 149th Street, 2nd Floor, Suite 200, Bronx, New York, on November 4, 2021 V.M. was allegedly prescribed Lidocaine 4.5% and menthol 5% patches, for which D & D Drugs Inc (not named a defendant in the Complaint) billed Plaintiffs

$1,191.90, as well as 200g diclofenac 3% topical gel, for which A and V Pharmacy Inc (not named as a defendant in the Complaint) billed Plaintiffs $1,892.13, inclusive of $5.00 in pharmacy dispensing fees. Thereafter, on November 15, 2021, V.M. was allegedly prescribed 250g Lidocaine 5% ointment, as well as 45 tablets of ibuprofen 400 mg, 15 tablets of baclofen 20 mg, 42 tablets of omeprazole 20mg and 30 tablets of Esgic 50-325-40, which was purportedly dispensed on November 16, 2021, and for which Tree of Life RX Inc. (not named a defendant in the Complaint) billed Plaintiffs $1,771.59.  On March 28, 2022, V.M. was prescribed 250g Lidocaine 5% ointment, 30 tablets Naproxen Sodium 550mg, and 30 tablets of Cyclobenzaprine HCL 10mg, which was purportedly dispensed by First Class Pharmacy Corp (not named a defendant in the Complaint) on April 5, 2022, and for which it billed Plaintiffs $1,648.76, inclusive of $15.00 in pharmacy dispensing fees.  Thereafter, on April 14, 2022, V.M. was again allegedly prescribed 200g Lidocaine 5% ointment and 90 tablets of Cyclobenzaprine HCl 5 mg, as well as 30 tablets of Meloxicam 15 mg, which was purportedly dispensed by Q Pharmacy on April 22, 2022 and for which it billed Plaintiffs $1,459.00 inclusive of $5.00 in pharmacy dispensing fees.  Thereafter, on May 3, 2022, V.M. was allegedly prescribed another course of 250g Lidocaine 5% ointment, 30 tablets of Cyclobenzaprine HCl 10 mg and 30 tablets of Naproxen Sodium 550mg, which was purportedly dispensed on May 16, 2022, and for which EZRX Chemists Corp (not named as a defendant in the Complaint) billed Plaintiffs $2,042.00.  Thereafter, on April 6, 2023, V.M. was purportedly prescribed 30 tablets of Cyclobenzaprine HCl 7.5 mg, 30 tablets of Naproxen 500mg, and 120g Methyl Salicylate 25% external cream, for which Putnam RX Inc (not named a defendant in the Complaint) billed Plaintiffs $523.32, inclusive of $15.00 in pharmacy dispensing fees. Ultimately, Plaintiffs were billed at least $1,191.90 for Lidocaine 4.5% and menthol 5% patches, $1,887.13 for 200g diclofenac 3% topical gel, $6,177.30 for 950g of Lidocaine 5% ointment, $222.60 for 90 tablets of Naproxen 550mg, $327.52 for 150 tablets of Cyclobenzaprine, as well as $10.61 for 45 tablets of ibuprofen 400 mg, $65.37 for 15 tablets of baclofen 20 mg, $49.51 for 30 tablets of Esgic 50-325-40, $113.30 for 42 tablets of omeprazole 20mg, $116.10 for 30 tablets of Meloxicam 15 mg, and $327.36 for 120g Methyl Salicylate 25% external cream.

- Covered Person S.C. (claim no. 0631971603-01) was allegedly involved in a motor vehicle accident on July 3, 2021. As part of a purported course of treatment at a No-fault clinic located at 1735 Pitkin Avenue, Brooklyn, New York, on September 20, 2021 S.C. was allegedly prescribed Diclofenac Sodium 3% gel, 250g Lidocaine 5% ointment and 60 tablets of Celecoxib 250mg, which was purportedly dispensed by Fill RX NY Inc. (not named as a defendant in the Complaint) on October 12, 2021, and for which it billed Plaintiffs $4,717.30.  Thereafter, S.C. was referred to S.C. was referred to Metropolitan Medical and Surgical, P.C. (not named as a defendant in the Complaint), where S.C. ultimately underwent percutaneous

discectomy/disc decompression surgery and epidural injections on March 7, 2022. Thereafter, on March 22, 2022, Metropolitan Medical and Surgical, P.C. allegedly prescribed another course of 200g of Lidocaine 5% ointment, as well as 30 tablets of Cyclobenzaprine 5 mg and 30 tablets of Meloxicam 15 mg, which Q Pharmacy purportedly dispensed on March 24, 2022, and for which it billed Plaintiffs $1,380.70, inclusive of $5.00 in pharmacy dispensing fees. Ultimately, Plaintiffs were billed at least $3,122.50 for 450g of Lidocaine 5% ointment, as well as $2,360.00 for Diclofenac Sodium 3% gel, $454.80 for 60 tablets of Celecoxib 250mg, $116.40 for 30 tablets of Meloxicam 15 mg and $39.30 for 30 tablets of Cyclobenzaprine 5 mg.

113.    In 2015, the Department of Health and Human Services, Office of the Inspector General, issued a report noting the potential for fraud in abuse by pharmacies in New York related to the prescription, among other topical pain medications, diclofenac sodium 3% gel, and lidocaine 5% pain patches. *See Questionable Billing and Geographic Hotspots Point to Potential Fraud and Abuse in Medicare Part D,* OEI-02-15-00190 (June 2015).

114.    Moreover, in 2018 the U.S. Department of Health and Human Services, Office of the Inspector General, issued a report noting that fraud and abuse by pharmacies was significant in the prescribing and dispensing of products containing diclofenac and/or lidocaine.  *See, Questionable Billing for Compounded Topical Drugs in Medicare Part D*, OEI-02-16-00440 (August 2018).

115.    Here, by way of example and not limitation, the Topical Pain Pharmaceuticals and other select oral medications account for over 95% of the billing to Plaintiffs from Q Pharmacy.

116.    Q Pharmacy purports to be a storefront pharmacy operating in Astoria, New York, but does not advertise to the general public, have a website advertising its products or services, and does not otherwise market or seek business from individual patients.

117.    Instead, as part of their pattern, practice and protocol, and in furtherance of their massive scheme to defraud, Defendants entered into illegal, collusive agreements whereby the Pharmacy Defendants paid kickbacks to No-fault Clinics and Clinic Controllers in exchange for the

No-fault Clinics' and HCPs' prescribing large volumes of the Topical Pain Pharmaceuticals, including Lidocaine 5% ointment, Diclofenac Sodium 3% gel, Diclona gel, Lidocaine 5% patches, and Lidothol patches, and other select oral medications, including NSAIDs and muscle relaxers, which were specifically targeted for their high profit margins, and directing these prescriptions to be dispensed and billed by Q Pharmacy.

118.   In keeping with the fact that the Clinic Controllers directed these prescriptions to be dispensed by and billed for by Q Pharmacy, and not each Covered Person's chosen pharmacy, a large volume of prescriptions submitted as part of Q Pharmacy's claims for reimbursement were purported "telephone" prescriptions, rather than electronic prescriptions as is generally required by the New York Public Health Law.

119.   As of March 27, 2016, to combat the growing problem of prescription fraud, the New York Education Law § 6810(10) and New York Public Health Law § 281(3), except in limited circumstances, requires that all prescriptions issued in New York State must be prescribed electronically.

120.   The limited exceptions to the electronic prescription requirement include:

> prescriptions: (a) issued by veterinarians; (b) issued in circumstances where electronic prescribing is not available due to temporary technological or electrical failure, as set forth in regulation; (c) issued by practitioners who have received a waiver or a renewal thereof for a specified period determined by the commissioner, not to exceed one year, from the requirement to use electronic prescribing, pursuant to a process established in regulation by the commissioner, in consultation with the commissioner of education, due to economic hardship, technological limitations that are not reasonably within the control of the practitioner, or other exceptional circumstance demonstrated by the practitioner; (d) issued by a practitioner under circumstances where, notwithstanding the practitioner's present ability to make an electronic prescription as required by this subdivision, such practitioner reasonably determines that it would be impractical for the patient to obtain substances prescribed by electronic prescription in a timely manner, and such delay would adversely impact the patient's medical condition, provided that if such prescription is for a controlled substance, the quantity of controlled substances

does not exceed a five day supply if the controlled substance were used in accordance with the directions for use; or (e) issued by a practitioner to be dispensed by a pharmacy located outside the state, as set forth in regulation.

N.Y. Public Health Law § 281(3).

121.    In the limited circumstances which fall under the exceptions to the electronic prescription requirement, the New York Public Health Law requires that a written prescription be written on an official serialized New York State prescription blank bearing the prescriber's signature as well as a legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider. *See* N.Y. Public Health Law § 281(1).

122.    Given the limitations on telephone or oral prescriptions in New York, it is extremely unlikely that Q Pharmacy would receive large numbers of telephone prescriptions from multiple different healthcare providers at different locations, often not filled until days after they were received, that legitimately meet the conditions set forth in the New York Public Health Law.  Further, to the extent that Q Pharmacy received any such telephone prescriptions, Q Pharmacy's printed prescription records fail to provide any information that the identity of the person calling in the prescription were verified or the reason the prescription was not issued by telephone.

123.    Nevertheless, Q Pharmacy routinely submitted claims for reimbursement to Plaintiffs pursuant to purported telephone prescriptions.  Exhibit "4" in the accompanying Compendium of Exhibits is a representative sample of purported telephonic prescriptions that Q Pharmacy purportedly filled and submitted to Plaintiffs as part of their fraudulent claims for reimbursement.

124.    Moreover, a vast majority of the billing that Q Pharmacy submitted to Plaintiffs for reimbursement of pharmaceuticals dispensed, if at all, to Covered Persons came from a few prescribing physicians or practices, with a history of engaging in fraudulent No-fault billing schemes.

125.    By way of example but not limitation, numerous fraudulent prescriptions submitted in claims for reimbursement from Q Pharmacy to Plaintiffs were issued by medical providers that

purportedly provided services through Atlantic Medical & Diagnostic PC and/or Macintosh Medical PC, professional corporations in which Jonathan Landow ("Landow") is listed as the record owner and which operates out of several locations throughout the New York metropolitan area. Landow and several of his professional corporations in which he is listed as the record owner, including Atlantic Medical & Diagnostic, P.C. and Macintosh Medical PC, have been sued by multiple No-fault insurance carriers for allegedly engaging in a multimillion-dollar fraud scheme involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements. *See, e.g., Allstate Ins. Co., et al, v. Landow, M.D., et al.*, 24-cv-02010 (E.D.N.Y.); *Government Emp. Ins. Co., et al. v. Landow, M.D., et al.*, 21-cv-01440 (E.D.N.Y.); *Government Emp. Ins. Co., et al. v. Urban Medical, P.C., M.D., et al.*, 18-cv-02956 (E.D.N.Y.); *Travelers Pers. Ins. Co., et al. v. Landow, M.D., et al.*, Index No. 656567/2021 (N.Y. Sup. Ct., N.Y. County) .

126. By way of further example but not limitation, numerous other fraudulent prescriptions for Topical Pain Pharmaceuticals and/or other oral medications , resulting in claims submitted by Q Pharmacy to Plaintiffs, were issued by medical providers that purportedly provided medical services through Metropolitan Medical & Surgical P.C., a professional corporation in which Mark Gladstein ("Gladstein") is listed as the record owner. Gladstein has been sued by multiple No-Fault insurance carriers for allegedly engaging in engaging in a multimillion-dollar fraud scheme involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements. *See, e.g., Liberty Mutual Mid. Atlantic Ins. Co. et al. v. Advanced Comprehensive Laboratory, LLC, et al*, 22-cv-3541 (AMD)(JRC) (E.D.N.Y. 2022); *State Farm Mut. Auto. Ins. Co., et al. v. Metro Pain Specialists, P.C.*,

21-cv-5523 (MKB)(PK) (E.D.N.Y. 2021); *Government Employees Ins. Co. et al. v. Advanced Comprehensive Laboratory, LLC, et al.,* 20-cv-2391 (KAM)(VMS) (E.D.N.Y. 2020).

127.     By way of further example but not limitation, numerous other fraudulent prescriptions for Topical Pain Pharmaceuticals and/or other oral medications , resulting in claims submitted by Q Pharmacy to Plaintiffs, were issued by medical providers that purportedly provided medical services through BL Pain Management PLLC, a professional corporation in which Leonid Reyfman, M.D. ("Reyfman") is listed as the record owner.  Reyfman has also been sued by multiple No-fault insurance carriers for engaging in various fraud schemes including a scheme involving the prescription of medically unnecessary topical pain creams in exchange for illegal kickbacks and/or other financial arrangements. *See Liberty Mut. Ins. Co. et al. v. Woodside Chemists, Inc., et al.* 17-cv-6313 (ILG)(CLP) (E.D.N.Y. 2017); *see also Allstate Ins. Co. et al. v. Chillemi, et al.,* 19-cv-3051 (ERK)(VMS) (E.D.N.Y. 2019).

128.     These Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, were prescribed and dispensed pursuant to a predetermined protocol that lacked individualized care, was designed to exploit patients for financial gain, was implemented without regard to pharmacologic outcomes and was implemented with gross indifference to a patient's health and safety.

129.     On information and belief, in connection with the unlawful financial arrangements with No-fault Clinics, the Pharmacy Defendants would pay kickbacks to individuals associated with the No-fault Clinics in order to obtain referrals for the fraudulent Topical Pain Pharmaceuticals and/or other oral medications to be provided to Covered Persons who treated at the Clinics.

130.    On information and belief, in keeping with the fact that the prescriptions for Topical Pain Pharmaceuticals and/or other oral medications were the result of unlawful kickbacks and/or referral relationships between the pharmacy and the Clinics, Yusupov never met most of the physicians who purportedly signed the prescriptions that were provided to the Pharmacy Defendants.   Moreover, a number of the prescriptions submitted by Yusupov, through Q Pharmacy, to Plaintiffs were fabricated in order to misrepresent that medications were medically necessary, when in fact, the medications were provided, if at all, to financially enrich Yusupov through a fraudulent protocol of treatment.

131.    Further, the prescriptions from the Clinics were sent to and obtained by Q Pharmacy directly from the Clinics without any communication or involvement by the Covered Persons.   In further keeping with the fact that the prescriptions for the Topical Pain Pharmaceuticals and/or other oral medications were the result of unlawful financial arrangements between the Pharmacy Defendants and the No-fault Clinics, the Covered Persons were never given access to the prescriptions or given the option to use any other pharmacy other than Q Pharmacy.

132.    At all relevant times mentioned herein, the Topical Pain Pharmaceuticals and/or other oral medications supplied by Q Pharmacy was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, who provided the prescriptions to Q Pharmacy to be used in support of the fraudulent Topical Pain Pharmaceuticals and/or other oral medications claims that exploited and manipulated the payment formulas under the applicable Fee Schedule in order to maximize the charges that they could submit to Plaintiffs and other insurers.

133.    As a result of the unlawful kickback and/or other financial compensation agreements, the Pharmacy Defendants obtained large numbers of prescriptions and access to Covered Persons' identifying information that enabled them to bill hundreds of thousands of dollars to Plaintiffs, for just a few exorbitantly priced Topical Pain Pharmaceuticals and/or other oral medications.

134.    But for the payment of kickbacks from the Pharmacy Defendants, the No-fault Clinics, would not have had any reason to: (i) direct a substantial number of medically unnecessary prescriptions to Q Pharmacy; (ii) make the Covered Persons' information available to Q Pharmacy; and/or (iii) provide Q Pharmacy with the fraudulent prescriptions.

135.    Upon information and belief, the payment of kickbacks and/or other financial compensation  by the Pharmacy Defendants was made at or near the time the prescriptions were issued, but the Pharmacy Defendants and the No-fault Clinics affirmatively concealed the particular amounts paid since the payment of kickbacks in exchange for patient referrals violates New York law.

136.    As a result of the unlawful financial arrangements, the Pharmacy Defendants billed hundreds of thousands of dollars to Plaintiffs, and likely millions of dollars to other New York automobile insurers, for the Topical Pain Pharmaceuticals and/or other oral medications.

A.    **Fraudulent Dispensing and Billing of Topical Pain Pharmaceuticals Without Regard to Patient Care in Order to Exploit Patients for Financial Gain**

137.    As part of Defendants' scheme to defraud, Defendants entered into kickback or other financial arrangements with the No-fault Clinics, Clinic Controllers and/or HCPs, who instead of prescribing cheaper FDA-approved and/or commercially available medication to Covered Persons, would instead prescribe and/or dispense the Topical Pain Pharmaceuticals, including Lidocaine 5% ointment, Diclofenac Sodium 3% gel, Diclona gel, Lidocaine 5% patches, and Lidothol

patches, which were prescribed without regard to the efficacy and/or medical necessity of the drugs, and often combined these Topical Pain Pharmaceuticals with prescriptions for other select oral medications, including NSAIDs and muscle relaxers, which constituted therapeutic duplication, increasing the risk for adverse events in the Covered Persons without any additional therapeutic benefit.

138.    Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the No-fault Clinics, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the HCPs, as a result of kickbacks and/or other financial compensation agreements between the No-fault Clinics, Clinic Controllers, and Defendants, would prescribe Topical Pain Pharmaceuticals and/or other select oral medications, including NSAIDs and muscle relaxers, pursuant to a standard, predetermined protocol regardless of whether such pharmaceuticals were medically necessary.

139.    Such Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, were issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident and without first trying commercially available alternative medications that are FDA-approved and available at significantly less cost.

140.    In fact, pursuant to the standard, predetermined protocol, the Covered Persons were routinely prescribed the Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, without the prescribing provider first taking a detailed patient history and without determining whether the Covered Person was currently taking any medications or suffering from any comorbidities.

141.   Pursuant to the standard, predetermined protocol, the Covered Persons were routinely prescribed the Topical Pain Pharmaceuticals and/or other select oral medications, including NSAIDs and muscle relaxers, pursuant to regimented initial and follow-up examinations, which, on information and belief, were designed to justify continued, voluminous, and excessive use of prescribed pharmaceuticals.  The resulting examination reports rarely gave any indication as to why alternative FDA-approved and/or over-the-counter medications would not sufficiently address the Covered Person's condition.

142.   Irrespective of the needs of any individual Covered Person, the HCPs and No-fault Clinics prescribed the same Topical Pain Pharmaceuticals, which contained the exact same amount of simple ingredients, Lidocaine 5% ointment, Diclofenac Sodium 3% gel, Diclona gel, Lidocaine 5% patches, and Lidothol patches, and/or other pharmaceuticals to each and every Covered Person.

143.   On information and belief, as part of the kickback or other financial compensation agreement with the No-fault Clinics and Clinic Controllers, and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms in favor of Q Pharmacy, which, after execution, the Clinic Controllers or No-fault Clinics would cause to be transmitted to Q Pharmacy.

144.   In many if not all instances, the HCPs never provided Covered Persons with the prescriptions for Topical Pain Pharmaceuticals and other oral medications to be filled at a pharmacy chosen by the Covered Persons. Rather, the Covered Persons were given the Topical Pain Pharmaceuticals at the No-fault Clinic, ASCs, or at home by mail, without even being given the prescription, or in some instances, being told that such medication was being prescribed, to

eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate pharmacy.

145.    On information and belief, the prescriptions for Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, were filled by Q Pharmacy as part of illicit and collusive arrangements whereby, in exchange for issuing such prescriptions, the referring No-fault Clinics, Clinic Controllers and/or prescribing providers received illegal payments from Defendants.

146.    At all times relevant herein, Q Pharmacy, as well as the No-fault Clinics, Clinic Controllers and prescribing providers, knew that there were effective, commercially available, FDA-approved and cheaper medications which would have been suitable to prescribe to Covered Persons, and that the Topical Pain Pharmaceuticals and/or other select oral medications, including NSAIDs and muscle relaxers, were being prescribed solely to enrich Defendants, the No-fault Clinics and Clinic Controllers.

147.    In doing so, and as a result of Defendants' collusive agreements with No-fault Clinics, Clinic Controllers and/or HCPs, Defendants promoted the sale of the Topical Pain Pharmaceuticals and other select oral medications over effective, commercially available, FDA-approved, cheaper alternatives, and thereby exercised undue influence over the Covered Persons in order to exploit the Covered Persons for their own financial gain.

148.    Demonstrative that the No-fault Clinics prescribed the Topical Pain Pharmaceuticals in order to exploit the patient for financial gain, irrespective of medical necessity and without regard to genuine patient care, in virtually, if not all instances, the No-fault Clinics and/or HCPs routinely:

- Failed to document in the Covered Persons' initial or follow-up evaluation reports on why the Topical Pain Cream was medically necessary;

37

- Failed to document a detailed medical history in Covered Persons' initial or follow-up evaluation reports, thereby failing to fully examine or document potential contraindications or comorbidities;

- Failed to document in Covered Persons' initial or follow-up evaluation reports on why commercially available over-the-counter, FDA approved medications could not be prescribed instead of the Topical Pain Cream; and

- Failed to document in Covered Persons' follow-up reports if the Topical Pain Cream was used by Covered Persons, and if so, was medically beneficial.

149.     Defendants engaged in the scheme to defraud alleged herein when they knew, or should have known, that substantially cheaper and commercially available FDA-approved medications proven to have therapeutic effects were available.

150.     The Topical Pain Pharmaceuticals, including in the form of Diclofenac 3% gel and Lidocaine 5% ointment, could have and should have been replaced with cheaper, over-the-counter and readily available substitutes that have substantially similar, if not identical indications and effects.

151.     The Topical Pain Pharmaceuticals such as those dispensed by Q Pharmacy should be a final treatment option after oral medications and other commercially available, over-the-counter, FDA-approved topical creams are ineffective or not tolerated by patients.

### *Topical Lidocaine 5% Ointment and 5% Patches*

152.     In order to facilitate the fraud set forth herein, Covered Persons were routinely prescribed a particular Topical Pain Pharmaceuticals, in the form of topical Lidocaine 5% ointment and/or Lidocaine 5% transdermal patches, at voluminous rates and directed to have this prescription filled and dispensed (if at all) by Q Pharmacy, pursuant to Defendants' illicit, collusive arrangements with the No-fault Clinics, Clinic Controllers and/or HCPs, in order to maximize profits, at the expense of genuine patient care, medical necessity or pharmacological outcome.

153.    Nearly 70 percent of Q Pharmacy's billing for lidocaine-containing products came in the formulation of Lidocaine 5% ointment or Lidocaine 5% transdermal patches. The fact that Lidocaine was routinely dispensed and billed by Q Pharmacy in this specific concentration demonstrates a lack of individualized patient care.

154.    Lidocaine is a local anesthetic used to relieve neuropathic pain of post-herpetic neuralgia, also referred to as after-shingles pain, and to relieve skin irritations such as minor burns, sunburn, abrasions of the skin, insect bites and hemorrhoids.

155.    According to *New York State Workers' Compensation Board, Non-Acute Pain Medical Treatment Guidelines, (First Edition, September 15, 2014, page 38;* August 25, 2021 Update, effective May 2, 2022, page 39), *New York State Workers' Compensation Board, Mid and Low Back Injury, (First Edition, September 15, 2014;* August 25, 2021 Update, effective May 2, 2022, page 38) and the *New York State Workers' Compensation Board, Neck Injury, (First Edition, September 15, 2014;* August 25, 2021 Update, effective May 2, 2022, page 34): **"**Topical lidocaine is only indicated when there is documentation of a diagnosis of neuropathic pain. In this instance, a trial for a period of no greater than four weeks can be considered, with the need for documentation of functional gains as criteria for additional use."

156.    The prescribing providers routinely failed to document any functional deficit that could be managed by topical Lidocaine or a contraindication to use oral medications (as topical Lidocaine was routinely prescribed with oral pain relievers), demonstrating that the Lidocaine 5% (as an ointment or transdermal patch) was routinely dispensed as part of an illegal kickback arrangement in furtherance of the scheme to defraud alleged herein.

157.    By way of example and not limitation, Lidocaine 5% ointment and/or transdermal patches was prescribed to Covered Persons, dispensed by Q Pharmacy and billed to Plaintiffs

for reimbursement in the following instances where the medical reports recorded no incidence of neuropathic pain or any functional deficit appropriate for the prescription:

- Covered Person J.C. (Claim No. 0643652589-02) was allegedly involved in a motor vehicle accident on September 30, 2021. Thereafter, J.C. presented for treatment at a No-fault Clinic, Avenue Medical Care PC (not named as a defendant in the Complaint), located at 3052 Brighton 1st Street, Suite 402, Brooklyn, New York, where J.C. underwent an initial examination on October 5, 2021, and follow-up examinations on December 14, 2021 and March 22, 2022. The reports for these examinations only included diagnoses of shoulder, cervical, thoracic and lumbar strains/sprains, i.e., no neuropathic pain. Regardless, Q Pharmacy billed Plaintiffs for allegedly dispensing Lidocaine 5% ointment pursuant to a prescription allegedly issued by Phyllis Gelb, M.D. (not named a defendant in the Complaint) of Avenue Medical Care PC on October 14, 2021.

- Covered Person G.G. (Claim No. 0653715201-01) was allegedly involved in a motor vehicle accident on December 19, 2021. Thereafter, G.G. presented for treatment at a No-fault Clinic, Foster Medical PC (not named as a defendant in the Complaint), located 4720 Avenue N, Brooklyn, New York, where G.G. underwent an initial examination on January 5, 2022, and follow-up examinations on February 8, 2022, February 16, 2022 and March 30, 2022. The reports for these examinations only included diagnoses for cervical and thoracic sprains/strains, neck and thoracic pain, and sprains/strains of the left knee and right shoulder, i.e., no neuropathic pain. Regardless, Q Pharmacy billed Plaintiffs for allegedly dispensing Lidocaine 5% ointment pursuant to prescriptions allegedly issued by Denny Rodriguez, M.D. (not named as a defendant in the Complaint) of Foster Medical PC on February 7, 2022, and June 10, 2022.

- Covered Person R.A.C. (Claim No. 0680501574-01) was allegedly involved in a motor vehicle accident on August 8, 2022. Thereafter, R.A.C. presented for treatment at a No-fault Clinic, Atlantic Medical & Diagnostic, P.C. (not named as a defendant in the Complaint), located 1320 Louis Nine Boulevard, Bronx, New York, where R.A.C. underwent an initial examination on August 15, 2022, and a follow-up examination on December 5, 2022. The reports for these examinations only included diagnoses for cervical and lumbar sprains/strains, knee sprain and shoulder derangement, i.e., no neuropathic pain. Regardless, Q Pharmacy billed Plaintiffs for allegedly dispensing Lidocaine 5% ointment pursuant to a prescription allegedly issued by Mathew Ajin, P.A. (not named as a defendant in the Complaint) of Atlantic Medical & Diagnostic, P.C. on December 5, 2022.

158.    Even if initial or follow-up evaluation reports by the prescribing provider listed any genuine patient need for lidocaine ointment, which it often did not, the reports routinely failed to include any potential reason why prescription Lidocaine 5% ointment and/or transdermal patches were medically necessary above and beyond a substantially similar and/or lower strength alternatives that were FDA-approved and commercially available at a fraction of the cost, such as Aspercreme, Icy Hot and Bengay.

159.    Q Pharmacy billed between $610.00 and $1,833.46 to fill each prescription for Lidocaine 5% ointment. However, over-the-counter alternatives, such as Aspercreme and Icy Hot, are commercially available at a retail cost of less than $20, for tubes greater than 50g, and contain Lidocaine 4%.

160.    Q Pharmacy billed between $224.70 and $251.69 for each package of 30 Lidocaine 5% transdermal patches, totaling between $224.70 and $678.92 to fill each prescription.  However, over-the-counter alternatives such as Aspercreme, Icy Hot, or pharmacy brands such as CVS or Walgreens, which contain Lidocaine 4%, are commercially available at a retail cost of less than $13 for 5 patches, or roughly one third of the unit cost billed by Q Pharmacy.

161.    Despite this disparity in cost for a substantially similar product, on information and belief, Q Pharmacy regularly dispensed and billed for Lidocaine 5% ointment and/or transdermal patches without any indication in the examination reports that the patient first tried any commercially available alternative, even for minor sprains.

162.    By way of example and not limitation, Q Pharmacy dispensed Lidocaine 5% ointment and/or transdermal patches for Covered Persons and submitted bills to Plaintiffs for reimbursement even though the evaluation reports and/or other documentation in support of this billing demonstrated no medical necessity for Lidocaine 5% ointment instead of Lidocaine 4%

ointment or any indication that the significantly cheaper, commercially available alternative was considered:

- Covered Person A.J. (Claim No. 0635102980-01) was allegedly involved in a motor vehicle accident on July 13, 2021. Thereafter, A.J. presented for treatment at a No-fault Clinic located at 61-31 Woodhaven Boulevard, Rego Park, New York, where he purportedly underwent an initial examination by Eric S. Berger, M.D. (not named as a defendant in the Complaint) on July 14, 2021, and thereafter, a follow-up examination on October 5, 2021. Even though Eric S. Berger, M.D.'s reports made no mention of A.J. having first tried any lower dosage of Lidocaine patches, Lidocaine 5% patches were prescribed on July 14, 2021, and dispensed by Defendant Q Pharmacy on August 4, 2021.

- Covered Person M.O. (Claim No. 0684921893-01) was allegedly involved in a motor vehicle accident on September 15, 2022. Thereafter, M.O. presented for treatment at a No-fault Clinic located at 55 Second Avenue, Suite 1, Brentwood, New York, where she purportedly underwent an initial evaluation by Navdeep Kaur, N.P. (not named as a defendant in the Complaint) of Orthomed Health P.C. (not named as a defendant in the Complaint) on October 31, 2022.  Even though Orthomed Health P.C.'s report made no mention of M.O. having first tried any lower dosage of Lidocaine patches, Lidocaine 5% patches were prescribed on October 31, 2022, and dispensed by Defendant Q Pharmacy on November 3, 2022.

- Covered Person J.A. (Claim No. 0683675391-02) was allegedly involved in a motor vehicle accident on August 31, 2022. Thereafter, J.A. presented for treatment at a No-fault Clinic located at 3310 101st Street, Corona, New York, where she purportedly underwent an initial evaluation by Matthew Prince, N.P. (not named as a defendant in the Complaint) of Happy Apple Medical Services, PC (not named as a defendant in the Complaint) on October 5, 2022.  Even though Happy Apple Medical Services, PC's report made no mention of J.A. having first tried any lower dosage of Lidocaine ointment, Lidocaine 5% ointment prescribed on October 5, 2022, and dispensed by Defendant Q Pharmacy on October 19, 2022.

163.    Additionally, Q Pharmacy also routinely dispensed and billed Plaintiffs for reimbursement of Lidocaine 5% ointment and/or transdermal patches despite the fact that it was prescribed concurrently with oral medications, such as NSAIDs and muscle relaxers, and/or concurrently with another Topical Pain Cream, such as Diclofenac 3% gel, in order to maximize profits without regard for patient care. By way of example and not limitation, Q Pharmacy

submitted supporting documentation to Plaintiffs for reimbursement of Lidocaine 5% ointment concurrently with other medications in the following instances :

- Covered Person E.L. (Claim No. 0619196248-01) was allegedly involved in a motor vehicle accident on March 16, 2021. Thereafter, E.L. presented at a No-fault Clinic located at 1320 Louis Nine Boulevard, Bronx, New York, where he was purportedly examined by Mathew Ajin, P.A. (not named a defendant in the Complaint) of Macintosh Medical PC (not named as a defendant in the Complaint) on March 22, 2021, and thereafter, a follow-up examination on April 26, 2021. Q Pharmacy then billed Plaintiffs for allegedly dispensing Lidocaine 5% ointment simultaneously with Diclofenac Sodium 3% gel, 60 capsules of Celecoxib 200mg, an oral NSAID, and 30 tablets of baclofen 20 mg, an oral muscle relaxer, on May 1, 2021, pursuant to prescriptions allegedly issued by Mathew Ajin, P.A. on April 26, 2021.

- Covered Person V.C. (Claim No. 0625091319-06) was allegedly involved in a motor vehicle accident on May 3, 2021. Thereafter, V.C. presented at a No-fault Clinic located at 164-6 Northern Boulevard, #2F, Flushing, New York, where she was purportedly examined by Demetrios Koutsospyros, M.D. (not named as a defendant in the Complaint) of Pain Physicians NY (not named as a defendant in the Complaint) on May 25, 2021, and, thereafter, follow-up examinations on June 29, 2021, November 16, 2021 and January 25, 2022.  Q Pharmacy then billed Plaintiffs for allegedly dispensing Lidothol 4.5-5% patches simultaneously with Naproxen 500mg tablets, an oral NSAID, on February 10, 2022, pursuant to prescriptions allegedly issued by Demetrios Koutsospyros, M.D. on January 25, 2022.

- Covered Person O.I. (Claim No. 0638735688-02) was allegedly involved in a motor vehicle accident on August 27, 2021. Thereafter, O.I. presented at a No-fault Clinic located at 3310 101ST Street, Corona, New York, where she was purportedly examined by Matthew Prince, N.P. (not named as a defendant in the Complaint) of Pedro Torres-Jimenez MD, PC (not named as a defendant in the Complaint) on September 15, 2021.  Q Pharmacy then billed Plaintiffs for allegedly dispensing Lidocaine 5% ointment simultaneously with ibuprofen 800mg tablets, an oral NSAID, and cyclobenzaprine 10mg tablets, an oral muscle relaxer, on September 30, 2021, pursuant to prescriptions allegedly issued by Matthew Prince, N.P. on September 15, 2021.

164.    Exhibit "5" in the accompanying Compendium of Exhibits is a spreadsheet listing representative sample of claims submitted by Q Pharmacy in which Q Pharmacy billed for simultaneously dispensing Lidocaine 5% ointment and/or transdermal patches with Diclofenac

Sodium 3% gel, and/or an oral NSAID with or without an oral muscle relaxant. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0701304495-06, 0654328434-02, 0635102980-01, 0633074679-02, 0630205516-02, 0623677143-02, and 0619196248-07, in which Q Pharmacy mailed fraudulent claims for simultaneously dispensing Lidocaine 5% ointment with Diclofenac Sodium 3% gel, and/or an oral NSAID with or without an oral muscle relaxant, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary pharmaceuticals in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

165. Moreover, Lidocaine 5%, whether administered in ointment or a transdermal patch, is not without risks or side effects, and the increased dosage at which the Prescribing No-fault Clinics and prescribing providers prescribed the Lidocaine increases the risk of the side effects associated with the medication.

166. Excessive dosage or short intervals between doses of Lidocaine 5% can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest.

167. Patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% ointment should not exceed 5 grams, and no more than 20 grams of ointment should be used in a single day. However, any maximum dosage was virtually never included on the prescriptions for Lidocaine 5% ointment purportedly filled by Q Pharmacy, which instead, routinely instructed patients to apply as many as 2-4 times per day to the affected area and/or as needed.

168.    By engaging in a fraudulent scheme whereby Lidocaine 5% ointment and transdermal patches were routinely prescribed without medical necessity, instead of (and without first prescribing) lower-strength, FDA-approved commercially available products, and without indication on the prescriptions as to safe dosage, Defendants placed their financial gain above genuine patient care and demonstrated a gross indifference to a patient's health and safety.

169.    Q Pharmacy was not and is not entitled to any reimbursement from Plaintiffs for the Lidocaine 5% ointment or Lidocaine 5% transdermal patches.

170.    The bills mailed by Q Pharmacy were fraudulent in that they misrepresented that (i) the Lidocaine 5% ointment were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; and (iii) they were prescribed by legitimate medical providers when in fact they were provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics. In these and numerous other ways alleged herein, the Pharmacy Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive Lidocaine 5% ointment that they were not entitled to receive under the No-fault law and implementing regulations.

171.    Defendants' activities described herein with respect to the Lidocaine 5% ointment and transdermal patches promoted and facilitated other acts that imposed foreseeable costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, IMEs, and peer reviews.

### *Topical Diclofenac Gel*

172.    In order to facilitate the fraud set forth herein, Covered Persons at the Prescribing No-fault Clinics were routinely prescribed a particular Topical Pain Cream, in the form of topical

Diclofenac Sodium 3% gel, at voluminous rates and directed to have this prescription filled and dispensed by Q Pharmacy, pursuant to Defendants' illicit, collusive arrangements with the Prescribing No-fault Clinics, Clinic Controllers and/or prescribing providers, in order to maximize profits, at the expense of genuine patient care, medical necessity or pharmacological outcome.

173.    Q Pharmacy routinely billed Plaintiffs for topical Diclofenac in the form of Diclofenac Sodium 3% gel. The fact that Diclofenac was routinely dispensed and billed by Q Pharmacy in this specific formulation demonstrates a lack of individualized patient care.

174.    Diclofenac gel or cream is a topical NSAID that is commonly used to treat osteoarthritis and skin irritations such as actinic keratosis ("AK"), a type of warty skin growth.

175.    Notwithstanding any potential application of lower dosage pain patches and topical applications of Diclofenac Sodium available over-the-counter, and ignored by the Prescribing No-fault Clinics, Diclofenac Sodium 3% gel does not have any proven efficacy or safety in the treatment of musculoskeletal injuries such as sprains or strains, and such application of Diclofenac Sodium 3% Gel is not an accepted off-label use.

176.    Even if initial or follow-up evaluation reports by the prescribing provider listed any genuine patient need for Diclofenac, which it often did not, the reports routinely failed to include any potential reason why Diclofenac Sodium 3% gel was medically necessary above and beyond a substantially similar and/or lower strength alternatives that were FDA-approved and commercially available at a fraction of the cost. Exhibit "6" in the Compendium of Exhibits is a spreadsheet listing representative sample of claims submitted by Q Pharmacy in which Q Pharmacy billed for Diclofenac Sodium 3% gel where the initial or follow-up examination report corresponding to the prescription purportedly filled by Q Pharmacy did not include any indication that a lower strength alternative was attempted but failed during a conservative course of treatment

and failed to include any other potential reason why Diclofenac Sodium 3% gel was medically necessary above and beyond a substantially similar lower strength commercially available over-the-counter alternative. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0619196248-01, 0625091319-06, 0635102980-01, and 0681219077-01, in which Q Pharmacy mailed fraudulent claims for Diclofenac Sodium 3% gel, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary pharmaceuticals in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

177.   By engaging in a fraudulent scheme whereby Diclofenac Sodium 3% gel was routinely prescribed without medical necessity, instead of (and without first prescribing) lower-strength, FDA-approved commercially available products, Defendants placed their financial gain above genuine patient care and demonstrated a gross indifference to a patient's health and safety.

178.   Q Pharmacy billed $944.00 to $1,892.00 to fill a single prescription of Diclofenac Sodium 3% gel.

179.   Diclofenac Sodium is not without risks or side effects, and the increased dosage at which the Prescribing No-fault Clinics and prescribing providers prescribed the Diclofenac increases the risk of the side effects associated with the medication.

180.   The major risks associated with Diclofenac Sodium 3% gel include heart and blood vessel issues, including heart disease, heart attack and stroke, as well as severe stomach and bowel issues, including ulcers, intestinal bleeding or perforation. The associated risks are high in those

with pre-existing cardiovascular and gastrointestinal issues.  The risks are also greater with higher doses and long-term use.

181.    In fact, the United States Food and Drug Administration ("FDA") requires a "Black Box" warning for topical Diclofenac, which the FDA imposes when a drug carries a serious safety risk.  For topical Diclofenac, the "Black Box" warning lists the risks of serious cardiovascular and gastrointestinal events, which can be fatal.

182.    Furthermore, topical Diclofenac is classified as a NSAID and prescribing it concurrently with other oral NSAIDs, such as ibuprofen, naproxen, and/or meloxicam, could result in an increased risk of adverse events, such as hemorrhage, or a higher rate of gastrointestinal toxicity.  FDA product labels for over-the-counter brands of a lower dosage of topical Diclofenac contain warnings to this effect and generally recommend against concomitant use.

183.    By way of example and not limitation, Defendants' fraudulent scheme set forth herein resulted in therapeutic duplication with Diclofenac being prescribed concurrently with oral NSAIDs in the following occasions:

- Covered Person J.L. (Claim No. 0691696560-06) was allegedly involved in a motor vehicle accident on October 6, 2022. Thereafter, J.L. presented at the No-fault Clinic located at 468 Hempstead Turnpike, Elmont, New York, where he was purportedly examined by Mark Gladstein, M.D. (not named a defendant in the Complaint) of Macintosh Medical PC (not named as a defendant in the Complaint) on January 17, 2023 and thereafter, a follow-up examination on March 28, 2023. Q Pharmacy then billed Plaintiffs for allegedly dispensing Diclofenac Sodium 3% gel simultaneously with 60 tablets of Naproxen Sodium 550mg, an oral NSAID, on March 30, 2023, pursuant to prescriptions allegedly issued by Mark Gladstein, M.D. on March 28, 2023.

- Covered Person L.R. (Claim No. 0693716748-05) was allegedly involved in a motor vehicle accident on November 26, 2022. Thereafter, L.R. presented at the No-fault Clinic located at 1735 Pitkin Ave, 2nd Fl, Brooklyn, NY 11212, where she was purportedly examined by Cristy Perdue, M.D. (not named as a defendant in the Complaint) of Metropolitan Medical and Surgical, P.C. (not named as a defendant in the Complaint) on April 14,

2023. Q Pharmacy then billed Plaintiffs for allegedly dispensing Diclofenac Sodium 3% gel simultaneously with 30 tablets of Meloxicam 15 mg, an oral NSAID, on April 26, 2023, pursuant to a prescription allegedly issued by Cristy Perdue, M.D. on April 14, 2023.

184.    Exhibit "7" in the accompanying Compendium of Exhibits is a spreadsheet listing representative sample of claims submitted by Q Pharmacy in which Q Pharmacy billed for simultaneously dispensing Diclofenac Sodium 3% gel with an oral NSAID.

185.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0609065636-02,  0619196248-01,  0619196248-07,  0623677143-02,  0630205516-02,  0633074679-02, 0684189111-01, 0688008549-06, and 0693390817-02, in which Q Pharmacy mailed fraudulent claims for Diclofenac Sodium 3% gel, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary pharmaceuticals in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

186.    On information and belief, Defendants' illegal, collusive arrangements with the No-fault Clinics, Clinic Controller and/or prescribing providers, which caused Diclofenac Sodium 3% gel to be prescribed to Covered Persons at excessive amounts without individualized care, was profit-driven and demonstrated a genuine disregard for the patients' health and safety.

187.    Q Pharmacy was not and is not entitled to any reimbursement from Plaintiffs for Diclofenac Sodium 3%  gel.

188.    The bills mailed by Q Pharmacy were fraudulent in that they misrepresented that (i) the Diclofenac Sodium 3% gel were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; and (iii) they were

prescribed by legitimate medical providers when in fact they were provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics. In these and numerous other ways alleged herein, the Pharmacy Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive Diclofenac Sodium 3% gel that they were not entitled to receive under the No-fault law and implementing regulations.

189.    Defendants' activities described herein with respect to Diclofenac Sodium 3% gel promoted and facilitated other acts that imposed foreseeable costs onto Plaintiffs, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, IMEs, and peer reviews.

### The Non-FDA Approved Topical Pain Pharmaceuticals

190.    In furtherance of the scheme to defraud, the Pharmacy Defendants obtained prescriptions and submitted to Plaintiffs nearly a quarter-million dollars in fraudulent claims for unapproved drugs.

191.    The United Stated Federal Food, Drug, and Cosmetic Act ("FDCA") authorizes the FDA to oversee the safety of food, drugs, and cosmetics.

192.    The FDA strictly regulates over-the-counter and prescription drugs, and oversees drug manufacturing in several ways, including testing drugs and routinely inspecting drug manufacturing plants and outsourcing facilities engaged in the compounding of drugs.

193.    Federal law requires all new drugs in the United States be shown to be safe and effective for their intended use prior to marketing.  According to the FDA, unapproved drugs pose significant risks to patients because they have not been reviewed by the FDA for safety, effectiveness, or quality.  Without FDA review, there is no way to know if these drugs are safe and

effective for their intended use, manufactured in a way that endures consistent drug quality, or whether their label is complete and accurate.

194.    Notwithstanding the foregoing, Q Pharmacy billed Plaintiffs nearly a quarter-million dollars for dispensing purported transdermal pain patches and topical gels to Covered Persons prescribed and billed as Lidocaine 4.5%-Menthol 5% patches (either generically or under the brand name Lidothol)("Lidothol patches"), and Lidocaine 4.5%-Diclofenac Sodium 1% gel (either generically or under the brand name Diclona) ("Diclona gel").

195.    The FDA considers Lidothol patches and Diclona gel to be unapproved drugs.

196.    Unapproved prescription drugs are only allowed to be marketed in limited circumstances, such as if the drug is subject to an open drug efficacy study or if health care professionals rely on the drug to treat serious medical conditions where there is no FDA-approved drug to treat the condition.  No exception applies to Lidothol patches or Diclona gel that may allow them to be marketed as prescription drug products.

197.    Moreover, New York Education Law § 6808-b requires any pharmacy, manufacturer, wholesaler, or outsourcing facility located outside the state that ships, mails or delivers prescription drugs or devices to other registered establishments, authorized prescribers and/or patients residing in the state be registered with the Department of Education.

198.    Based on the NDC codes appearing on Q Pharmacy's claims for reimbursement, all the Lidothol patches and Diclona gel purportedly dispensed and billed for by the Pharmacy Defendants was sourced from Terrain Pharmaceuticals LLC.

199.    Terrain Pharmaceuticals LLC is not registered as a drug supplier, manufacturer, or wholesaler doing business in the state of New York with the New York Department of Education,

as required by the New York Education Law and therefore, is not legally permitted to dispense, retail, wholesale, manufacturer or offer drugs for sale in New York.

200. Accordingly, Q Pharmacy is prohibited from selling drugs such as the Lidothol patches and Diclona gel purportedly dispensed to Covered Persons, that are purchased from Terrain Pharmaceuticals LLC, an un-registered out-of-state drug supplier.

201. To the extent that the Pharmacy Defendants circumvented the requirements of the New York Education Law by purchasing Lidothol patches and Diclona gel directly from an unregistered supplier, the patches remain "unapproved" drugs and no legitimate pharmacy owner would purchase and dispense as prescription drugs large volumes of unapproved drugs not reviewed by the FDA.

202. Similarly, no legitimate physician or healthcare provider would issue prescriptions for unapproved drugs like Lidothol patches or Diclona gel, particularly since there are numerous other FDA-approved drugs available that the physician or healthcare provider could prescribe without any extraordinary risk to the patient.

203. In short, the Defendants obtained prescriptions and dispensed and billed for "unapproved" drugs through Q Pharmacy without any way to know if the drugs are safe and effective, manufactured in a way that ensured consistent drug quality, or contained complete and accurate labelling –solely to exploit the patients for financial gain, without regard for genuine patient care.

204. Moreover, like HCPs prescription of Lidocaine 5% ointment and transdermal patches, and Diclofenac 3% gel, the HCPs virtually never recommended that Covered Persons first try over-the -counter products containing the same active ingredients as the Lidothol patches and

Diclona gel, or recorded in their evaluation reports that Covered Persons tried such products, which are FDA-approved and available to treat acute, minor sprains and strains.

205.     Q Pharmacy routinely billed Plaintiffs unit prices between $32.18-$40.40 per patch to fill a prescription ranging from 30-90 Lidothol (Lidocaine 4.5%-Menthol 5%) transdermal patches, resulting in charges between $965.40-$3,625.70 to fill a single prescription. However, over-the-counter alternatives, such as Walgreens' Cool n' Heat Patch, are commercially available at a retail cost amounting to $2 per patch and contain Lidocaine 4%-Menthol 1%.

206.     Q Pharmacy also routinely billed Plaintiffs between $1,877.04-$1,882.04 for a single prescription of Diclona (Lidocaine 4.5%-Diclofenac 1%) gel, dispensed as two 3.5oz tubes of gel. Instead, Covered Persons could obtain either a single 2.7oz tube of over-the-counter Lidocaine 4% ointment for under $10 or a single 3.5oz tube of over-the-counter Diclofenac 1% gel for under $20, and at the same time avoid therapeutic duplication by using only one active ingredient.

207.     On information and belief, Defendants' illegal, collusive arrangements with the No-fault Clinics, Clinic Controller and/or HCPs, which caused Lidothol patches and/or Diclona gel, or their generic equivalents, to be prescribed to Covered Persons at excessive amounts without individualized care, was profit-driven and demonstrated a genuine disregard for the patients' health and safety.

208.     Q Pharmacy was not and is not entitled to any reimbursement from Plaintiffs for either Lidothol patches, Diclona gel, or their generic equivalents.

209.     The bills mailed by Q Pharmacy were fraudulent in that they misrepresented that (i) the Lidothol patches and/or Diclona gel were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; and (iii)

they were prescribed by legitimate medical providers when in fact they were provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics. In these and numerous other ways alleged herein, the Pharmacy Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive Lidothol patches and/or Diclona gel that they were not entitled to receive under the No-fault law and implementing regulations.

210.    Defendants' activities described herein with respect to Lidothol patches and Diclona gel, and their generic equivalents, promoted and facilitated other acts that imposed foreseeable costs onto Plaintiffs, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, IMEs, and peer reviews.

### B.    Defendants' Scheme was Designed to Maximize Their Financial Gain

211.    Defendants targeted ingredients such as Diclofenac Sodium 3% and Lidocaine 5% to be part of the Topical Pain Pharmaceuticals routinely prescribed pursuant to the fraudulent scheme set forth herein because Q Pharmacy could readily purchase topical Diclofenac and Lidocaine at a low cost but bill out the Topical Pain Pharmaceuticals at egregiously high wholesale prices based on the Pharmacy Fee Schedule.

212.    Pursuant to the Pharmacy Fee Schedule governing topical pain cream products, Q Pharmacy was entitled to the average wholesale price (AWP) minus 12% (for brand name drugs) or 20% (for generic drugs) for each ingredient within the cream, together with a nominal dispensing fee.

213.    In connection with Q Pharmacy's request for reimbursement from Plaintiffs, Q Pharmacy typically submitted an NF-3 form, which included the purported NDC numbers and corresponding charges for each drug product dispensed.

214.    The NDC numbers listed on the NF-3 form submitted by Q Pharmacy are what identified the purported AWPs for each of the Topical Pain Pharmaceuticals and other select oral medications that Q Pharmacy purported to dispense.

215.    Defendants never submitted wholesale purchase invoices to Plaintiffs demonstrating how much Q Pharmacy actually paid the suppliers for Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, or whether Q Pharmacy actually purchased the pharmaceuticals with the NDC numbers listed in the billing submissions.

216.    On information and belief, the illegal kickback and referral arrangements Defendants entered into with Prescribing No-fault Clinics, Clinic Controllers and prescribing providers targeting these specific Topical Pain Pharmaceuticals and other select oral medicals, including NSAIDs and muscle relaxers, was motivated by profit maximization rather than genuine patient care.

217.    Defendants' activities described herein with respect to the Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, which were prescribed pursuant to a fraudulent scheme and pursuant to illegal, collusive kickback arrangements, promoted and facilitated other acts that imposed foreseeable costs onto Plaintiffs, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, IMEs, and peer reviews.

## <u>DISCOVERY OF THE FRAUD</u>

218.    To induce Plaintiffs to promptly reimburse their claims for the Topical Pain Creams, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- Yusupov, through Q Pharmacy, routinely and deliberately submitted facially valid claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;

- Yusupov, through Q Pharmacy, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement; and/or

- Yusupov, through Q Pharmacy, knowingly misrepresented and concealed that Q Pharmacy's claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement.

219. Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $469,000.00 based upon the fraudulent bill submissions.

220. Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered the fraud until in or about June 2023.

**STATEMENT OF CLAIMS**

**FIRST CLAIM FOR RELIEF**

**AGAINST YUSUPOV, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5**

**(RICO, pursuant to 18 U.S.C § 1962(c))**

221. The allegations of paragraphs 1 through 220 are hereby repeated and re-alleged as though fully set forth herein.

**THE RICO ENTERPRISE**

222. From in or about 2020 through the filing of this Complaint, Defendant Yusupov and one or more of the John Does 1 through 5 and ABC Corporations 1 through 5 conducted and participated in the affairs of the Q Pharmacy enterprise through a pattern of racketeering activity, including the many acts of mail fraud described herein and in the representative list of predicate acts, annexed hereto, all of which are incorporated by reference. Defendant's conduct constitutes a violation of 18 U.S.C. § 1962(c).

223. At all relevant times mentioned herein, Defendant Yusupov participated in the affairs of the Q Pharmacy enterprise through continuing a pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted fraudulent bills and supporting documents to Plaintiffs that were based, in part, on the dispensing of pharmaceutical products, including but not limited to Topical Pain Pharmaceuticals and/or select other oral medications, such as NSAIDs and muscle relaxers, (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) were the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.

224. One or more of the John Does 1 through 5 and one or more of the ABC Corporations 1 through 5 participated in the scheme by ensuring that the No-Fault Clinics provided the Q Pharmacy enterprise with a steady and ample supply of fraudulent prescriptions for medically unnecessary "pain relieving" pharmaceutical products, including Topical Pain Pharmaceuticals, and oral NSAIDS, muscle relaxants and other pain medications, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and

the No-fault Clinics or Clinic Controllers, as well as bogus documentation, that misrepresented necessity of the pharmaceutical products to facilitate the fraudulent billing alleged in the Complaint.  One or more of the ABC Corporations furnished documents that Defendant Yusupov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent pharmaceutical claims.

225.   It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics or Clinic Controllers, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

226.   The racketeering acts set forth herein were carried out on a continued basis for more than a four-year period, were related and similar, and were committed as part of the ongoing scheme of Yusupov, one or more of the John Does 1 through 5, and one or more of the ABC Corporations 1 through 5, to fraudulently bill pharmaceutical products, including but not limited to Topical Pain Pharmaceuticals and/or select oral medications, including NSAIDs and muscle relaxers, to defraud insurers and, if not stopped, will continue into the future.

227.   This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the Q Pharmacy enterprise continues to pursue collection on the fraudulent billing to the present day.

228.   As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Yusupov, with the knowledge and intent of one or more of the John Does 1 through 5 and one or more of the ABC Corporations 1 through 5,

caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce them to issue checks to Q Pharmacy RX, Inc. based upon materially false and misleading information.

229.    Through the Q Pharmacy enterprise, Yusupov submitted fraudulent claim forms seeking payment for pharmaceutical products, including but not limited to Topical Pain Pharmaceuticals and other select oral medications, such as NSAIDs and muscle relaxers, that were dispensed (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements that were the product of illegal and/or invalid prescriptions.  The bills and supporting documents that were sent by and/or on behalf of Yusupov and/or others acting under his direction and control, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Yusupov, one or more of the John Does 1 through 5, and one or more of the ABC Corporations 1 through 5 engaged in a continuous series of predicate acts of mail fraud.

230.    A sample list of predicate acts is annexed hereto which identifies the nature and date of mailings that were made by or on behalf of Yusupov in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

231.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

232.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

233.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property, in an amount in excess of $469,000.00, the exact amount to be determined at trial.

234.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover, from Yusupov, one or more of the John Does 1 through 5, and one or more of the ABC Corporations 1 through 5, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

## AGAINST Q PHARMACY AND YUSUPOV

### (Common Law Fraud)

235.     The allegations of paragraphs 1 through 220 are hereby repeated and re-alleged as though fully set forth herein.

236.     Defendants Q Pharmacy and Yusupov intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, made numerous false and misleading statements of material fact as to the necessity and price of the pharmaceutical products which they purportedly dispensed, thereby inducing Plaintiffs to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature. As part of the fraudulent scheme implemented by Yusupov, Q Pharmacy made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

237.     Defendants Q Pharmacy and Yusupov intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the bills submitted to them for reimbursement of No-fault benefits for services relating to the dispensing of pharmaceutical products, including but not limited to the Topical Pain

Pharmaceuticals and select other oral medications, including NSAIDs and muscle relaxers, were misrepresented.

238.    Defendants Q Pharmacy and Yusupov intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the pharmaceutical products which they purportedly dispensed, including but not limited to the Topical Pain Pharmaceuticals and select other oral medications, including NSAIDs and muscle relaxers, were dispensed (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) as the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.

239.    Defendants Q Pharmacy and Yusupov intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the services were provided pursuant to a protocol that was intended to maximize Defendants' profits and reimbursements of payments from Plaintiffs, as opposed to medical necessity.

240.    On information and belief, Defendants Yusupov, through Q Pharmacy intentionally, knowingly, fraudulently, and with the intent to deceive, submitted, or caused to be submitted to Plaintiffs, patient medical records, assignments of benefits, prescriptions, reports, treatment verifications and/or bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

- False and misleading statements that Q Pharmacy was dispensing Topical Pain Pharmaceuticals and select oral medications, including NSAIDs and muscle relaxers, pursuant to legitimate New York State Prescriptions, when it was not;

- False and misleading statements that Q Pharmacy was billing Plaintiffs the maximum permissible charges under the No-fault Law for the Topical Pain Pharmaceuticals and select other oral medications, including NSAIDs and muscle relaxers, allegedly provided to Covered Persons, when it was not;

- False and misleading statements that Q Pharmacy was in conformance with core licensing requirements and entitled to receive No-fault benefits when in fact Defendants participated in collusive relationships with medical providers through which Defendant filled prescriptions pursuant to an illegal kickback and referral scheme for medically unnecessary pharmaceuticals;

- False and misleading statements as to why the Topical Pain Pharmaceuticals and select oral medications, including NSAIDs and muscle relaxers, were medically necessary; and

- False and misleading statements regarding the availability of over-the-counter, FDA approved medications in lieu of Topical Pain Pharmaceuticals and select oral medications that were purportedly provided by Defendants as part of a predetermined protocol of treatment.

241. In numerous instances, the medical records, reports, prescriptions and bills submitted, or caused to be submitted, by Defendants Yusupov, through Q Pharmacy to Plaintiffs in connection with Defendants' requests for reimbursement contained false representations which were intended not only to defraud Plaintiffs but constituted a grave and serious danger to the Covered Persons and the consumer public.

242. The foregoing was intended to deceive and mislead Plaintiffs into believing that Yusupov, through Q Pharmacy, was providing medically necessary Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, when, in fact, they were not.

243. Defendants Q Pharmacy and Yusupov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

244.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which they were led to believe as a result of Defendants' acts of fraud and deception.

245.    Had Plaintiffs known of the fraudulent content of, and misrepresentations within the documentation and bills, submitted to them, Plaintiffs would not have paid Q Pharmacy for claims for No-fault insurance benefits submitted in connection therewith.

246.    Furthermore, Defendants Q Pharmacy and Yusupov's far-reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

247.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount in excess of $469,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

**THIRD CLAIM FOR RELIEF**

**<u>AGAINST DEFENDANTS Q PHARMACY AND YUSUPOV</u>**

**(Unjust Enrichment)**

248.    The allegations of paragraphs 1 through 220 are hereby repeated and re-alleged as though fully set forth herein.

249.    By reason of their wrongdoing, Defendants Q Pharmacy and Yusupov have been unjustly enriched, in that they have, directly and/or indirectly, received monies from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

250.     Plaintiffs are therefore entitled to restitution from Defendants Q Pharmacy and Yusupov in the amount by which they have been unjustly enriched.

251.     By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount in excess of $469,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**FOURTH CLAIM FOR RELIEF**

**AGAINST Q PHARMACY**

**(Declaratory Judgment under 28 U.S.C. § 2201)**

252.     The allegations of paragraphs 1 through 220 are hereby repeated and re-alleged as though fully set forth herein.

253.     At all relevant times mentioned herein, each and every bill mailed by Yusupov, through Q Pharmacy, to Plaintiffs, sought reimbursement for medically unnecessary "pain relieving" pharmaceutical products, including Topical Pain Pharmaceuticals and a limited variety of other oral medications.

254.     At all times relevant herein, Defendants Q Pharmacy and Yusupov exploited the No-fault Law through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing pursuant to an unlawful kickback/referral arrangement.

255.     At all relevant times mentioned herein, each and every bill mailed by Q Pharmacy to Plaintiffs sought reimbursement for Topical Pain Pharmaceuticals and/or select other oral medications, including NSAIDs and muscle relaxers, that were dispensed: (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws

regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements and the product of illegal and/or invalid prescriptions.

256.    Because Q Pharmacy engaged in the conduct alleged herein, Plaintiffs seek a declaration that they are not required to pay any of Q Pharmacy's claims for Topical Pain Pharmaceuticals and/or select oral medications, including NSAIDs and muscle relaxants, which were dispensed pursuant to the scheme to defraud alleged herein.

257.    As the Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the pharmaceuticals purportedly provided to Covered Persons and the amounts they were entitled to be reimbursed, it is respectfully requested that this Court issue an order declaring that Q Pharmacy is not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of Q Pharmacy's No-fault claims.

258.    The Defendants will continue to seek reimbursement from Plaintiffs for their false and fraudulent claims absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

259.    Plaintiffs have no adequate remedy at law.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)      Compensatory damages, in an amount in excess of $469,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)     Punitive damages in such amount as the Court deems just;

iii)     Treble damages, costs and reasonable attorneys' fees on the First Claim for Relief, together with prejudgment interest;

iv)     Compensatory and punitive damages on the Second Claim for Relief, together with prejudgment interest;

v)     Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi)     Declaratory relief on the Fourth Claim for Relief declaring that Plaintiffs have no obligation to pay any of Defendant Q Pharmacy's unpaid claims for Topical Pain Pharmaceuticals and/or select oral medications, whether pending, previously denied and/or submitted, regardless of whether such unpaid claims were ever denied, and regardless of the purported dates of service; and

vii)     Costs, reasonable attorneys' fees and such other relief that the Court deems just and proper.

Dated: New York, New York,
       September 19, 2024

                                     MANNING & KASS, ELLROD,
                                       RAMIREZ, TRESTER LLP


By: _/s/ Lee Pinzow_____
     Robert A. Stern
     James A. McKenney
     Kristy R. Eagan
     Lee Pinzow

     100 Wall Street, Ste 700
     New York, New York 10005
     (212) 858-7769

     *Attorneys for Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company*

67

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, <br><br>            **Plaintiffs,** <br><br> -against- <br><br> Q PHARMACY RX INC, BORIS YUSUPOV, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5, <br><br>            **Defendants.** | CIVIL ACTION <br><br> 24-CV-6617 <br><br> COMPLAINT <br><br> (JURY TRIAL DEMANDED) |

# COMPLAINT

MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS FOR PLAINTIFFS
100 WALL STREET, SUITE 1900
NEW YORK, NEW YORK 10005
TELEPHONE: (212) 858-7769